UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. ___1:21mj02614 Goodman - 3CBU___

UNITED STATES OF AMERICA,

v.

**ADALBERTO COMPARAN-BEDOLLA,**
**CARLOS BASAURI-COTO,**
**SILVIANO GONZALEZ-AGUILAR,**
**and SALVADOR VALDEZ,**

**Defendants.**

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?  __ Yes  X  No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? __ Yes  X  No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?  __ Yes  X  No

4. Did this matter originate from a matter pending in the Southern Region of the United States Attorney's Office prior to November 23, 2020 (Judge Aileen M. Cannon)? __ Yes X_  No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

By: _____
Frederic C. Shadley
Assistant United States Attorney
Court ID No. A5502298
11200 N.W. 20th Street
Miami, Florida 33172
(305) 715-7649
(305) 715-7639 (fax)
Frederic.Shadley@usdoj.gov

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   1:21mj02614 Goodman - 3CBU |
| Adalberto Comparan-Bedolla, et al., | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   January 21, 2021 - March 30, 2021   in the county of   Miami-Dade County   in the

Southern   District of   Florida   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 963 | Conspiracy to Import 500 Grams or More of a Mixture and Substance |
| 21 U.S.C. § 952(a) | Containing a Detectable Amount of Methamphetamine |
| 21 U.S.C. § 960(b)(1)(H) | Importation of 500 Grams or More of a Mixture and Substance Containing a |
| 18 U.S.C. § 2 | Detectable Amount of Methamphetamine |
| | |
| 21 U.S.C. § 841(a)(1) | Conspiracy to Possess with Intent to Distribute 500 Grams or More of a |
| 21 U.S.C. § 846 | Mixture and Substance Containing a Detectable Amount of Methamphetamine |
| 21 U.S.C. § 841(b)(1)(A)(viii) | Possession with Intent to Distribute 500 Grams or More of a Mixture and |
| 18 U.S.C. § 2 | Substance Containing a Detectable Amount of Methamphetamine |
| | |
| 18 U.S.C. § 1956(h) | Conspiracy to Launder Money |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Special Agent Shad Aschleman, DEA
_Printed name and title_

Attested to in accordance with the requirements
of Federal Rule of Criminal Procedure 4.1 by   Face Time

_____
_Judge's signature_

Date:   3/31/21

City and state:                   Miami, FL                   Hon. Jonathan Goodman, U.S. Magistrate Judge
_Printed name and title_

**AFFIDAVIT**

I, Shad Aschleman, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I have been a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA) since 2004, and am currently assigned to DEA Miami Field Division, High Intensity Drug Trafficking Area (HIDTA) Task Force, Group 41. I am a criminal investigator for the United States within the meaning of Title 21, United States Code, Section 878, and therefore I am empowered to conduct investigations of, and make arrests for, offenses enumerated in Title 21 and Title 18.

2.     Based on information contained in this Affidavit, I respectfully submit there is probable cause for the issuance of a criminal complaint charging Adalberto COMPARAN-BEDOLLA, Carlos BASAURI-COTO, Silviano GONZALEZ-AGUILAR and Salvador VALDEZ, as follows:

   a. Conspiracy to import 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 963 and 841(b)(1)(A)(viii) (COMPARAN-BEDOLLA);

   b. Importation of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 952(a), 841(b)(1)(A)(viii), and 18 U.S.C. § 2 (COMPARAN-BEDOLLA);

   c. Conspiracy to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii) (COMPARAN-BEDOLLA, BASAURI-COTO, GONZALEZ-AGUILAR and VALDEZ);

   d. Possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§

1

841(a)(1), 841(b)(1)(A)(viii), and 18 U.S.C. § 2 (COMPARAN-BEDOLLA, BASAURI-COTO, GONZALEZ-AGUILAR and VALDEZ); and

e.   Conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); all in violation of 18 U.S.C. § 1956(h) (BASAURI-COTO).

3.   The facts set forth in this Affidavit are based on my personal knowledge and observations, the knowledge and observations of other law enforcement personnel and civilian witnesses, information and documents received in my official capacity from other sources of information, and information gained through my training and experience.  This Affidavit is submitted for the limited purpose of establishing probable cause and thus does not include each and every fact known to law enforcement about this investigation.

**PROBABLE CAUSE**

4.   Beginning in January of 2021, a Confidential Source ("CS") acting at the direction of law enforcement conducted a series of meetings in Colombia with members of the United Cartels from Michoacán, Mexico.  Those individuals included Alfonso RUSTRIAN and Adalberto Fructuoso COMPARAN-RODRIGUEZ.  According to RUSTRIAN, he was a Cali-based money launderer and cocaine broker that regularly distributed approximately 25 kilograms of cocaine from Colombia, to Mexico, and ultimately into the United States.  RUSTRIAN is a criminal associate of Adalberto Fructuoso COMPARAN-RODRIGUEZ – the former mayor of the municipality Aguililla, located in Michoacán, Mexico.  According to RUSTRIAN, COMPARAN-RODRIGUEZ is a leader of the United Cartels in Mexico, and a former member of the Knights Templar Cartel.  According to RUSTRIAN, COMPARAN-RODRIGUEZ is a distributor of heroin and methamphetamine from Michoacán, Mexico to the United States, including Houston, Texas, and Atlanta, Georgia.

5.      During the month of January 2021, the CS had several meetings with RUSTRIAN while in Cartagena, Colombia.   Those meetings were audio and video recorded.   During the meetings, RUSTRIAN stated that he was living in Cali, Colombia at the time because people owed him money.   He requested assistance from the CS in locating those people.   RUSTRIAN told the CS that the people owed him approximately $300,000. RUSTRIAN explained that he was involved in a business transaction involving the importation of Colombian mineral salt to Mexico. The CS had asked RUSTRIAN why he imported mineral salt into Mexico, as Mexico already has an abundance of it.   RUSTRIAN eventually admitted that the mineral salt transaction involved a scheme where cocaine is converted to mineral salt for shipment to Mexican cartels.

6.      On or about January 21, 2021, at a restaurant in Cali, Colombia, RUSTRIAN introduced the CS to COMPARAN-RODRIGUEZ.   That meeting was audio and video recorded. During the meeting, the CS told COMPARAN-RODRIGUEZ that he worked with a group of Lebanese people that were looking to fund the political campaigns of government officials in Mexico. The CS further explained that he was a representative of Hezbollah and the Hassan NASRALLAH family, and that he handled their distribution of cocaine in the United States. The CS told COMPARAN-RODRIGUEZ that he wanted assistance in Mexico so that Hezbollah operatives could enter the United States in order to commit crime there.   COMPARAN-RODRIGUEZ replied by explaining that he had created an auto-defense group in the town of Aguililla, in Michoacán, Mexico.  Based on my training and experience, I know that auto-defense groups are groups in Mexico created by prominent local citizens, and are formed to fight back against the violence of the drug cartels.  However, in this case, the auto-defense group founded by COMPARAN-RODRIGUEZ eventually became involved in drug trafficking.   According to COMPARAN-RODRIGUEZ, he wanted to use an organization of auto-defense groups to eliminate "El Mencho's" cartel – the Cartel Jalisco Nueva Generación ("CJNG").  Based on my

3

training and experience, I know that "El Mencho" refers to Nemesio Oseguera Cervantes, the leader of the CJNG.   COMPARAN-RODRIGUEZ told the CS that he is involved in the distribution of crystal methamphetamine and heroin from Michoacán, Mexico, to Houston, Texas and Atlanta, Georgia. COMPARAN-RODRIGUEZ further explained that he currently had 300 kilograms of crystal methamphetamine in Atlanta, Georgia, as well as access to heroin.

7.     The CS explained that a kilogram of crystal methamphetamine in South Florida costs approximately $14,000 for bulk orders, and that a kilogram of heroin costs approximately $70,000. The CS explained that he takes one kilogram of heroin, and then cuts it with fentanyl in order to make 4 kilograms of heroin for his customers in South Florida. The CS then told COMPARAN-RODRIGUEZ that he wanted to purchase approximately 500 kilograms of crystal methamphetamine for importation from Mexico to South Florida. After negotiating the price, they initially settled on 250 kilograms of crystal methamphetamine at $14,000 per kilogram.   They would later decide on a total of 500 kilograms.   The CS offered to pay for the drugs with weapons, but COMPARAN-RODRIGUEZ replied that he wanted to be paid in money, so that he could take control in Michoacán.    COMPARAN-RODRIGUEZ explained to the CS that the crystal methamphetamine would be shipped dissolved in liquid house paint, which is undetectable.

8.     The CS told RUSTRIAN that, as the broker of the deal, he could make a profit and be paid a commission. RUSTRIAN said that he wanted to be paid approximately $4,000 for every kilogram of crystal methamphetamine sold.   The CS eventually agreed to pay RUSTRIAN approximately $35,000 per 12.5 kilograms of methamphetamine sold, for a total commission of $1.8 million.  RUSTRIAN offered to receive payments for the meth into a Citibank account owned by his friend who owns a company in Mexico.

9.     On or about January 26, 2021, COMPARAN-RODRIGUEZ sent the CS a video clip of a poppy field in Michoacán, and stated that this was where the heroin came from.  On or

4

about the same date, RUSTRIAN sent the CS photos showing that he (RUSTRIAN) had made a payment of approximately $23,000 to COMPARAN-RODRIGUEZ for expenses involved in the methamphetamine sale.  That money was to pay for pre-cursor chemicals for the meth, and transport-related expenses.

10.     On or about February 3, 2021, RUSTRIAN sent a picture to the CS of a handwritten timeline for the expected transaction.  That original timeline included the following:

   a.   February 5, 2021: delivery of raw material

   b.   February 6-12, 2021: processing

   c.   February 15-16, 2021: arrival of "amigos" – a coded reference to the meth

11.     On or about February 5, 2021, the CS, acting at the direction of law enforcement, conducted a virtual money flash of bulk U.S Currency to RUSTRIAN using an encrypted video conferencing app.  During their call, RUSTRIAN was located in Mexico City, Mexico.  After establishing a video connection, the CS told RUSTRIAN he had approximately $6 million dollars present and panned his cell phone across a green suitcase which contained several plastic wrapped bundles of purported bulk U.S. Currency. RUSTRIAN then replied to the CS, "Yes brother that is very good you are almost done."  The CS then told RUSTRIAN, "All the money is also wrapped inside these boxes," and showed several wrapped appliance boxes.  The CS told RUSTRIAN that he also needed the list of the items from COMPARAN-RODRIGUEZ in order to extract the methamphetamine from the house paint once it arrived in Miami.  RUSTRIAN responded that he would call COMPARAN-RODRIGUEZ about the issue.

12.     On or about February 9th, 11th, and 12th, RUSTRIAN sent pictures to the CS showing the methamphetamine production. RUSTRIAN also confirmed that Carlos BASAURI-COTO would be travelling to the United States to meet with the CS to discuss the laundering of

their drug proceeds. According to RUSTRIAN, BASAURI-COTO was responsible for conducting a significant portion of RUSTRIAN's money laundering in the United States and Mexico.

13.     On or about February 10, 2021, the CS was contacted by BASAURI-COTO, who told the CS that he had landed at the airport in Miami, and was ready to be picked up. The CS drove to the airport, picked up BASAURI-COTO, and drove him to his hotel in Miami. A short time later, the CS and BASAURI-COTO met in the hotel's restaurant. Their meeting was audio and video recorded. During the meeting, the CS and BASAURI-COTO discussed the money they needed to launder for RUSTRIAN, and came to the conclusion that they would need to move approximately $8,150,000. BASAURI-COTO told the CS that he had as many accounts as needed for the operation, and could handle whatever the CS needed. The CS then explained to BASAURI-COTO that he was going to be open concerning who the money belonged to. The CS told BASAURI-COTO that the money belonged to a large Lebanese organization, and that he couldn't lose any of the money. BASAURI-COTO stated that he understood and agreed. The CS was referring to Hezbollah. The CS further stated that the Lebanese have heroin and meth, etc., and that he could provide a sample if required.

14.     The CS told BASAURI-COTO that all the money is involved with drugs. He then added, however, that he and BASAURI-COTO didn't have anything to do with that, they would just handle the money. The CS asked BASAURI-COTO if he had help in the banks. BASAURI-COTO responded in the affirmative, but clarified that they may not want to do cash. The CS then asked for more information about the accounts BASAURI-COTO had access to. BASAURI-COTO provided the CS with bank account information for three of his different companies that they would use. He added that his mother and brother had full control of their accounts.

15.     The CS then asked BASAURI-COTO if he had a location that could hold cash if needed. BASAURI-COTO responded that they could use his grandmother's condo located in

Aventura, Florida, which was being transferred into his mother's name.  According to BASAURI-COTO, he had even suggested building a safe inside of it.  BASAURI-COTO provided the address for the home to the CS, and offered to show it to him.

16.     After discussing his ability to store large amounts of cash, BASAURI-COTO then explained the businesses he would use to move the money from the methamphetamine sale.  He explained that he could put $3,000,000 through his shoe company, and $1,000,000 through his investment company.  To that end, BASAURI-COTO showed the CS pictures of shoes and face masks his company sells.  He suggested they could use those products as cover investments for the money they were laundering.  BASAURI-COTO also provided the CS with a gift on behalf of RUSTRIAN, a personally decorated tequila bottle, in gratitude for the opportunity to work together.

17.     In addition to using his companies, BASAURI-COTO suggested that, because RUSTRIAN had control of an airport in Mexico, they could put the cash on a plane and fly it back to Mexico.  BASAURI-COTO suggested using the Opa Locka airport in South Florida for departure from Florida to Mexico.  During the meeting with the CS, BASAURI-COTO called RUSTRIAN and proposed the airplane idea to him.  RUSTRIAN said he had thought of it before, and they all agreed it was a good idea that they should consider.

18.     After hanging up with RUSTRIAN, the CS suggested that they could use fake contracts with BASAURI-COTOS's shoe company, along with corrupt notaries, to move $3,000,000.  Then, they could place $4,150,000 on the plane in cash.  BASAURI-COTO felt this was a good idea if they could do it.  The meeting concluded shortly thereafter

19.     On or about February 15, 2021, RUSTRIAN sent the CS several pictures and videos that RUSTRIAN had received from COMPARAN-RODRIGUEZ.  Those pictures and videos from

COMPARAN-RODRIGUEZ showed COMPARAN-RODRIGUEZ, his son Adalberto COMPARAN-BEDOLLA, and RUSTRIAN's girlfriend preparing the methamphetamine.

20. On or about February 18, 2021, RUSTRIAN sent photos to the CS of heroin processing in Michoacán. On March 4, 2021, according to RUSTRIAN, he met with COMPARAN-RODRIGUEZ in Mexico City to discuss the timing of the sale of methamphetamine to the CS in South Florida.

21. Soon after the March 4, 2021 meeting between RUSTRIAN and COMPARAN-RODRIGUEZ, RUSTRIAN told the CS that COMPARAN-RORIGUEZ's son, Adalberto COMPARAN-BEDOLLA, would be traveling to Miami to coordinate the first shipment of methamphetamine – roughly 200 kilograms of the planned 500 kilograms. On or about March 11, 2021, COMPARAN-BEDOLLA arrived at Miami International Airport from Mexico City. The CS went to the airport and picked up COMPARAN-BEDOLLA. On the drive from the airport, the CS asked COMPARAN-BEDOLLA if he had the list of materials needed to extract the crystal methamphetamine from the paint once the shipment arrived. COMPARAN-BEDOLLA responded yes, he had that information in his head. COMPARAN-BEDOLLA said that they likely needed to purchase several things, but the chemist who was coming to help them with the extraction would also arrive with certain materials. COMPARAN-BEDOLLA and the CS agreed to purchase the materials the next day in case the chemist did not bring all the material required. The CS drove COMPARAN-BEDOLLA to a hotel in Hialeah, Florida, that had been reserved by RUSTRIAN. However, the hotel had not yet been paid for. So the CS contacted RUSTRIAN for payment information, and RUSTRIAN emailed his credit card information to hotel management.

22. The next morning, March 12, 2021, the CS and COMPARAN-BEDOLLA went to several stores in Hialeah Gardens, Florida, to purchase the materials required to extract the crystal

methamphetamine from the house paint.  Those materials included an aluminum pot, coolers, knives, plastic containers, a propane burner, a propane tank, measuring cups and a thermometer.

23.     The CS and COMPARAN-BEDOLLA then went back to the hotel, and the CS met with an undercover agent ("UC1") who was presented as a worker for the CS.  At that meeting, the CS and COMPARAN-BEDOLLA provided UC1 with all the materials they had purchased that day. COMPARAN-BEDOLLA then explained to UC1 the process of extracting the methamphetamine from the paint. COMPARAN-BEDOLLA told UC1 that he knows the entire process except one step, which is separating the paint from the meth oil.

24.     On or about March 19, 2021, the plan for the delivery of the methamphetamine changed, and the CS was informed that the initial shipment of methamphetamine would not arrive in paint, but in large concrete tiles.  That same day, COMPARAN-BEDOLLA told the CS that two truckers had been hired by the organization to transport the concrete tiles containing crystal methamphetamine to Miami.  This was the methamphetamine that the CS had previously negotiated with RUSTRIAN and COMPARAN-RODRIGUEZ.  The tiles containing the meth had come from Mexico, and were stashed by the organization in Texas.  The two drivers, then, would drive the tiles containing meth on a truck from Texas to Hialeah, Florida.  Of note, about a week before this change in plans, 1,000 kilograms of methamphetamine in paint were seized after crossing a bridge from Mexico to Texas.  Based on my training and experience, I believe this interception caused COMPARAN-RODRIGUEZ and his co-conspirators to change their plans.

25.     During the drive from Texas to Florida the truck drivers sent regular location updates (and photographs) to the CS and COMPARAN-BEDOLLA.  During the transport, COMPARAN-BEDOLLA was in constant communication with his father, COMPARAN-RODRIGUEZ.  A number of those communications were recorded by the CS who was present with COMPARAN-BEDOLLA.

26.     The truck transporting the methamphetamine arrived in South Florida on the evening of March 20, 2021.  The truck drove to an undercover law enforcement warehouse in the Miami area.  When the truck arrived, COMPARAN-BEDOLLA called his father and told him that the drivers had arrived at the warehouse.  An additional undercover agent ("UC2") used a forklift to remove four crates of concrete tile from the truck's trailer.  The tile was placed into the warehouse, and the drivers left the area.  After the drivers left, UC1, UC2, the CS, and COMPARAN-BEDOLLA broke the tiles open using hammers.  From within the tiles, law enforcement recovered approximately 200 kilograms of wrapped methamphetamine.  The methamphetamine was field tested, which confirmed that it was in fact methamphetamine.  The undercover warehouse was wired to record audio and video, and the removal of the methamphetamine from the tiles was recorded by law enforcement.

27.     On March 21, 2021, the CS picked up BASAURI-COTO and drove him to dinner.  During the car ride, the CS asked BASAURI-COTO if he (BASAURI-COTO) knew that the CS was a criminal.  BASAURI-COTO confirmed that he did know that.  The CS then told BASAURI-COTO that he had received 200 kilograms of crystal methamphetamine on March 20, 2021, and he would provide money for payment once the second shipment (300 kilograms) arrived.  BASAURI-COTO told the CS he would stay in Miami until the second shipment arrived, so that he could accept the payment.  The CS replied that he would pay BASAURI-COTO an additional amount for the extended stay, and that RUSTRIAN had agreed with this arrangement.

28.     On or about March 21, 2021, RUSTRIAN contacted the CS and told the CS that he was with COMPARAN-RODRIGUEZ, and one of COMPARAN-RODRIGUEZ's lieutenants named "Gordo."  According to RUSTRIAN, Gordo reached out to him because he (Gordo) and COMPARAN-RODRIGUEZ were partial owners of the crystal methamphetamine shipment that was sent to the CS.  On the call, RUSTRIAN explained to the CS that Gordo wanted the

opportunity to purchase weapons from the CS. COMPARAN-RODRIGUEZ had told Gordo that the CS previously offered the cartel weapons in exchange for narcotics during their January meeting in Cali. In light of Gordo's interest in the firearms, the CS explained that he could possibly arrange for the delivery of a shipping container, or half of a container, full of firearms. The CS asked where he should ship the firearms, and RUSTRIAN offered a location in Guatemala where the cartel had the port "greased." According to RUSTRIAN, the cartel was interested in obtaining fifty caliber sniper rifles and multiple different types of machine guns. After the call, the CS contacted RUSTRIAN via text message. RUSTRIAN told the CS that both Gordo and COMPARAN-RODRIGUEZ had been present with him during the discussion about firearms.

29.     On or about March 23, 2021, COMPARAN-BEDOLLA told the CS that, instead of 300 more kilograms of methamphetamine, they would be receiving 350 kilograms of methamphetamine, and it would be shipped in house paint. That paint was shipped from Mexico, through Texas, and represents the final portion of the original 500-kilogram deal that the CS, RUSTRIAN, and COMPARAN-RODRIGUEZ had agreed to in January 2021.

30.     On or about the evening of March 26, 2021, a truck delivered approximately 245 five-gallon buckets of paint to an undercover warehouse in the Miami area. The truck was driven by the same driver, and used the same trailer, as the previous delivery of 200 kilograms of methamphetamine in large concrete tiles. The warehouse was wired to record audio and video.

31.     Early on the morning of March 27, 2021, the CS, COMPARAN-BEDOLLA, UC1 and UC2 arrived at the warehouse and unloaded the paint buckets into the warehouse. After unloading the paint buckets, the CS and COMPARAN-BEDOLLA left the warehouse in order to meet with two chemists what had been sent by COMPARAN-RODRIGUEZ to help with the extraction of the methamphetamine from the paint. The CS and COMPARAN-BEDOLLA drove to the hotel where the chemists were staying, and they had the chemists follow in their own vehicle

back to the warehouse. The chemists were identified as Silviano GONZALEZ-AGUILAR and Salvador VALDEZ.

32.     Once inside the warehouse, VALDEZ explained that he had helped pack the pallets holding the paint buckets in Houston, for shipment to Miami. The CS, UC1, UC2 and COMPARAN-BEDOLLA then helped the chemists remove the buckets that contained methamphetamine from the pallets. Of the approximately 245 paint buckets, 35 contained methamphetamine mixed with paint, while the remaining buckets held only paint. The parties removed those 35 buckets from the pallets there were packed on. The chemists agreed to demonstrate the methamphetamine extraction process on three of the buckets in order to teach the CS and both UCs how extract the methamphetamine. Then, the CS and UCs would handle the extraction process for the remaining 32 buckets.

33.     Later in the day on March 27, 2021, the chemists went shopping for additional materials required to process the paint. After purchasing the required materials, the chemists came back to the warehouse and began the process of extraction along with COMPARAN-BEDOLLA, the CS, and the UC's. They continued working through midnight that evening.

34.     The next day, March 28, 2021, GONZALEZ-AGUILAR and VALDEZ returned to the warehouse after having breakfast with COMPARAN-BEDOLLA. At the warehouse, while being audio and video recorded, COMPARAN-BEDOLLA, GONZALEZ-AGUILAR, VALDEZ, the CS, and both UCs continued the extraction process. They worked throughout the rest of the day. After the chemists had left for the evening, law enforcement tested the substance they had been working on extracting, and it field tested positive for methamphetamine. Law enforcement also field tested the paint/meth mixture in the buckets that had not yet been processed, and that material field tested positive for methamphetamine as well.

35.     That same day, March 28, 2021, the CS again met with BASAURI-COTO.  They discussed the money that BASAURI-COTO would need to move.  The CS explained again how COMPARAN-RODRIGUEZ was late with the original 200 kilograms of methamphetamine, and now again with the methamphetamine in paint.  However, the CS confirmed that he would have the $4,150,000 initially agreed upon for delivery on Tuesday, March 30, 2021.  BASAURI-COTO agreed, and the meeting ended.

36.     On Tuesday March 30, 2021, both UCs continued to extract meth with COMPARAN-BEDOLLA, GONZALEZ-AGUILAR and VALDEZ at the warehouse.  They ultimately were able to extract roughly eighteen pounds of methamphetamine from two buckets of paint.  That methamphetamine was later seized by law enforcement, and field-tested positive for methamphetamine.  That same day, the CS had arranged for UC1, COMPARAN-BEDOLLA and BASAURI-COTO to meet at a local hotel to transfer the expected $4,150,000 in drug proceeds.  That afternoon, UC1 and COMPARAN-BEDOLLA met with BASAURI-COTO.  After brief introductions with all three, BASAURI-COTO said that he would move his vehicle closer.  He moved the car two spaces and opened the trunk area.  UC1 and COMPARAN-BEDOLLA removed a large suitcase from their trunk and placed it in BASAURI-COTO's vehicle.  UC1 then opened the suitcase and displayed a large amount of fake currency.  BASAURI-COTO agreed that it looked good, and shut his hatch/trunk.  At that point, both BASAURI-COTO and COMPARAN-BEDOLLA were arrested.

37.     Shortly thereafter, the arrest team drove to the undercover warehouse and arrested GONZALEZ-AGUILAR and VALDEZ.

38.     Also on March 30, 2021, the CS met in Guatemala with COMPARAN-RODRIGUEZ and RUSTRIAN – in relation to their previously arranged firearms transaction.

After meeting and discussing the proposed transaction, COMPARAN-RODRIGUEZ and RUSTRIAN were arrested pursuant to a Provisional Arrest Warrant.[1]

39.     After their arrests, law enforcement interviewed BASAURI-COTO, GONZALEZ-AGUILAR, and VALDEZ.  They each signed a waiver of rights form, waived their *Miranda* rights, and agreed to speak with law enforcement.  BASAURI-COTO at first denied knowledge of the crimes, but later admitted that the money he was picking up probably came from drugs.  GONZALEZ-AGUILAR admitted, among other things, that he had been processing methamphetamine in Miami.  VALDEZ admitted, among other things, that he had been processing methamphetamine in Miami.

## CONCLUSION

40.     Based on the information contained in this Affidavit, I respectfully submit there is probable cause for the issuance of a criminal complaint charging Adalberto COMPARAN-BEDOLLA, Carlos BASAURI-COTO, Silviano GONZALEZ-AGUILAR and Salvador VALDEZ as follows:

  a.  Conspiracy to import 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 963 and 841(b)(1)(A)(viii) (COMPARAN-BEDOLLA);

  b.  Importation of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 952(a), 841(b)(1)(A)(viii), and 18 U.S.C. § 2 (COMPARAN-BEDOLLA);

  c.  Conspiracy to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21

---

[1] COMPARAN-RODRIGUEZ and RUSTRIAN were previously charged via separate criminal complaint in the Southern District of Florida.

U.S.C. §§ 846 and 841(b)(1)(A)(viii) (COMPARAN-BEDOLLA, BASAURI-COTO, GONZALEZ-AGUILAR and VALDEZ);

d. Possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 18 U.S.C. § 2 (COMPARAN-BEDOLLA, BASAURI-COTO, GONZALEZ-AGUILAR and VALDEZ); and

e. Conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); all in violation of 18 U.S.C. § 1956(h) (BASAURI-COTO).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Special Agent Shad Aschleman
Drug Enforcement Administration

Attested to in accordance with the requirements of
Federal Rule of Criminal Procedure 4.1 by __Face Time__

Hon. Jonathan Goodman
U.S. Magistrate Judge
Southern District of Florida

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NUMBER:** 1:21mj02614 Goodman - 3CBU

### BOND RECOMMENDATION

DEFENDANT: Adalberto Fructuoso Comparan-Bedolla

Pre-Trial Detention

(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____

AUSA:   Frederic C. Shadley

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):   S/A Shad Aschleman
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)
DEA

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NUMBER:** 1:21mj02614 Goodman - 3CBU

## BOND RECOMMENDATION

DEFENDANT: Carlos Basauri-Coto

Pre-Trial Detention

(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____

AUSA:   Frederic C. Shadley

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s):      S/A Shad Aschleman
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)
DEA

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NUMBER:** 1:21mj02614 Goodman - 3CBU

## **BOND RECOMMENDATION**

DEFENDANT: Silviano Gonzalez-Aguilar

Pre-Trial Detention

(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____

AUSA:    Frederic C. Shadley

Last Known Address: _____

_____

What Facility: _____

_____

Agent(s):          S/A Shad Aschleman
          (FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)
          DEA

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NUMBER:** 1:21mj02614 Goodman - 3CBU

## BOND RECOMMENDATION

DEFENDANT: Salvador Valdez

Pre-Trial Detention

(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____

AUSA:   Frederic C. Shadley

Last Known Address: _____

_____

What Facility: _____

_____

Agent(s):        S/A Shad Aschleman

(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)

DEA